Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James F. Holderman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 3215 | **DATE** | 9/6/2001 |
| **CASE TITLE** | TRANZACT TECHNOLOGIES vs. EVERGREEN PARTNERS et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry]  Pursuant to Memorandum Opinion and Order entered this day, plaintiff's motion for summary judgment is granted. This action is dismissed in its entirety. All other pending motions are moot. All previously set dates are stricken.
(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | **Document Number** |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | SEP 0 7 2001 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | FILED FOR DOCKETING | docketing deputy initials | 32 |
| | Copy to judge/magistrate judge. | 01 SEP -7 AM 8:26 | 9/6/2001 date mailed notice | |
| JS | courtroom deputy's initials | Date/time received in central Clerk's Office | JS mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED

SEP 7 2001

TRANZACT TECHNOLOGIES, LTD., )
)
Plaintiff / Counter - defendant, )
)
v. ) No. 00 C 3215
)
EVERGREEN PARTNERS, LTD., )
an Ohio partnership, and )
KELLOGG ASSOCIATES, INC., )
an Ohio corporation, )
)
Defendants / Counter - plaintiffs. )

## MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, District Judge:

On January 3, 2001, plaintiff Tranzact Technologies, Ltd., ("Tranzact") filed a two-count amended complaint against defendants Evergreen Partners, Ltd., ("Evergreen") and Kellogg Associates, Inc. ("Kellogg"). In the amended complaint, plaintiff alleges that defendants breached an Engagement and Commission Agreement ("Agreement") and asks this court to determine the rights and liabilities of both plaintiff and defendants with respect to the Agreement. On February 6, 2001, defendants filed a counterclaim alleging plaintiff breached the Agreement. On July 9, 2001, Tranzact filed this motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. Having considered the matter fully, for all the reasons stated herein, plaintiff's motion for summary judgment is GRANTED. All contractual obligations of the parties have been satisfied under the Agreement, and no further monies or actions are due by either side. This case is dismissed in its entirety with prejudice.

# STATEMENT OF FACTS[1]

Plaintiff and defendants entered into the Agreement on June 24, 1997. Under the Agreement, defendants were to perform financial advisory services in preparation for the possible sale, investment in, or other disposition of Tranzact. It was the goal of Michael Regan ("Regan"), Chief Executive Officer of Tranzact to ultimately sell Tranzact. John Lane ("Lane"), a member of Evergreen, was the primary drafter of the Agreement and Lane drafted the Agreement with input from Dan Kellogg, a member of Kellogg and with comments from Regan. The Agreement sets forth the entire understanding of the parties relating to the subject matter of the advisory services to be performed by defendants as well as the fees to by paid by plaintiff, and supersedes and cancels any prior communications, understanding, and agreements between the parties.

Pursuant to the Agreement, defendants were responsible for establishing a range of market values for Tranzact, developing a general marketing and negotiating strategy, identifying potential investors, preparing marketing materials and performing any other services needed to accomplish Tranzact's goals and objectives. In exchange for these services, defendants were given the exclusive right to market Tranzact to potential investors, and Tranzact agreed to pay defendants a $25,000 "retainer" upon execution of the Agreement and an additional $15,000 "retainer" by October 15, 1997. See (Agreement, Section 4: Fees at 2).

Over and above the "retainer," Tranzact also intended to pay and defendants intended to receive an "investment banking fee." Under the Agreement, the "retainer" was intended to be an advance toward the "investment banking fee," and the "investment banking fee" was intended to be

---

[1] The following facts are undisputed and are taken from the plaintiff's and defendants' respective Local Rule 56.1(a) & (b) statements of material facts and accompanying exhibits.

"contingent payable upon successful completion of the Transaction." (Agreement, Section 4: Fees at 2). Additionally, the "investment banking fee" was intended to be payable ". . . in the event any Transaction is consummated within one year of the termination [of the Agreement]." (Agreement, Section 6: Termination of Engagement at 2).

On June 24, 1997, Tranzact paid defendants $25,000, and on October 31, 1997, Tranzact paid defendants $15,000. Meanwhile, upon execution of the Agreement on June 24, 1997, defendants began performing their advisory services. In January 1998, defendants requested and Tranzact paid to defendants a $20,000 advance on future "investment banking fees." Additionally, in October and December of 1998, defendants sent two invoices to Tranzact and Tranzact paid two invoices in the amount of $24,832 and $18,870 to defendants respectively for hourly services rendered. Only the payments paid on June 24, 1997, and on October 31, 1997, were required under the Agreement. On July 14, 1999, Tranzact formally terminated the Agreement by written notice.

In January 2000, Tranzact agreed to sell to Schneider National Inc. ("Schneider") the portion of its total assets constituting its freight payment division. ("Schneider Sale") The Schneider Sale closed on March 10, 2000, within one year of Tranzact's written notice of cancellation. Upon completion of the Schneider Sale, Schneider received the freight payment division of Tranzact in exchange for $17,500,000 consideration, and Schneider held no equity ownership in Tranzact.

Upon hearing of the Schneider Sale, defendants notified Tranzact that they were entitled to an "investment banking fee" in the amount of $875,000 based on the conditions and calculations of the Agreement. Under the Agreement, the "investment banking fee" is calculated as a percentage of a sum called the "Transaction Value." Specifically, the Agreement states, "The fees will be applied as a percentage of the Transaction Value. . ." The term "Transaction Value," however, is

3

not defined within the Agreement. The percentage to be applied to the "Transaction Value" ranges from 0% to 5% and is based upon an amount called the "Enterprise Value." The term "Enterprise Value" is set to a range from $0 to $50,000,000 and above and is defined as the "Total Transaction Value" divided by the percentage of equity ownership held by an investor after a "Transaction." A "Transaction" is defined as (1) the sale or other disposition to another corporation, person, or business entity (an "investor") all or a portion of Tranzact's stock or assets, (2) an equity or quasi-equity investment in Tranzact by an investor or (3) a merger, consolidation or other combination of Tranzact with an investor. The "Total Transaction Value" is defined under the Agreement as the total consideration paid for an equity interest in Tranzact, including any seller financing, plus assumed debt.

## STANDARD OF REVIEW

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in the nonmovant's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1996). This court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.

A party who bears the burden of proof on a particular issue, however, may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S. Ct.

4

2548, 2553 (1986). There is no issue for trial "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249, 106 S. Ct. at 2511.

It is not the function of this court to scour the record in search of evidence to defeat a motion for summary judgment; the nonmoving party must identify with reasonable particularity the evidence upon which that the party relies. Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 562 (7th Cir. 1996). The evidence relied upon must be competent evidence of a type otherwise admissible at trial. Id. Thus, a party may not rely upon inadmissible hearsay in an affidavit or deposition to oppose a motion for summary judgment. Russell v. Acme-Evans Co., 51 F.3d 64, 68 (7th Cir.1995) (hearsay testimony may not be considered in summary judgment proceeding).

ANALYSIS

I. Contract Formation

Whether a contract exists is a question of law. Corluka v. Bridgford Foods of Illinois, Inc., 284 Ill.App.3d 190, 194, 671 N.E.2d 814, 818 (1st Dist. 1996). Contracts are bargained-for exchanges. D. 56, Inc. v. Berry's Inc., 955 F.Supp. 908, 913 (N.D.Ill.1997). A contract, by ancient definition, is an agreement between competent parties, upon a consideration sufficient in law, to do or not do a particular thing. Id. (citations omitted). The elements of a contract are offer, acceptance, and consideration. Zernke v. City of Chicago, 100 F.3d 511, 513 (7th Cir.1996). "For a contract to exist, there must be both an offer and an acceptance, and the acceptance must comply strictly with the terms of the offer. An acceptance requiring any modification or change of terms constitutes a rejection of the original offer and becomes a counteroffer that must be accepted by the original offeror before a valid contract is formed." Ebert v. Dr. Scholl's Foot Comfort Shops, Inc., 137

Ill.App.3d 550, 558, 484 N.E.2d 1178, 1185 (5th Dist.1985) (citations omitted). "A court's principal goal in construing a contract is to ascertain and give effect to the parties' intent at the time they entered the contract. In order for a contract to exist, there must be mutual assent by the parties on the essential elements contained therein." Meyer v. Marilyn Meyer, Inc., 273 Ill.App.3d 882, 888, 652 N.E.2d 1233, 1235 (1st Dist.1995) (citations omitted).

In this case, Regan was interested in selling Tranzact in April of 1997, (Pl. Resp. to Defs.' Local Rule 56.1(B) Stmt. of Additional Facts ¶1), and Tranzact engaged defendants to perform various advisory services to assist Tranzact in negotiating the possible sale of Tranzact. (See Agreement Section 1 and Section 3). Pursuant to these intentions, this court finds that the Agreement evidences an offer, acceptance and consideration manifested in the Agreement's clear and unambiguous terms. Accordingly, this court holds as a matter of law that there was a binding and enforceable contract between the parties through which defendants were to provide financial, analytical, and other services to plaintiff in order to prepare plaintiff to ultimately be sold, in whole or in part, and plaintiff in exchange was to pay to defendants a $40,000 retainer, over two payments ("Services Contract").

In contrast, upon further review of the section of the Agreement calling for the payment of an "investment banking fee," and in viewing the evidence in light most favorable to the nonmoving party, this court finds that there was no meeting of the minds between the parties as to how to calculate the "investment banking fee" because the material term in the "investment banking fee" formula, "Transaction Value," was left undefined.

Although, "[a] contract may be enforced even though some contract terms may be missing or left to be agreed upon," Halloran v. Dickerson, 287 Ill.App.3d 857, 868, 679 N.E.2d 774, 782

(5th Dist.1997), for a valid contract to be formed, an "offer must be so definite as to its material terms or require such definite terms in the acceptance that the promises and performances to be rendered by each party are reasonably certain." (1 Williston, Contracts §§ 38 through 48 (3d ed. 1957); 1 Corbin, Contracts §§ 95 through 100 (1963).). When the terms of a contract are so uncertain that there is no basis for deciding whether the agreement has been broken, there is no contract as a matter of law. Academy Chicago Pub. v. Cheever, 144 Ill.2d 24, 30, 578 N.E.2d 981, 984 (Ill.1991).

It is undisputed that the parties intended to include within the Services Contract a provision that allowed for the payment of an "investment banking fee" at the completion of a qualifying "Transaction." See (Pl.'s Resp. to Defs.' Local Rule 56.1(B) Stmt. of Additional Facts ¶3); (Defs.' Resp. to Pl.'s Local Rule 56.1(A) Stmt. of Facts ¶29). Even though the parties intended to form a contract as to the payment of an "investment banking fee," the Agreement pursuant to that intention is unduly uncertain and indefinite such that no contract was formed as to the payment of an "investment banking fee". 1 Williston § 37; 1 Corbin § 95. Specifically, as to how the "investment banking fee" was to be calculated, the Agreement provides:

> Section 4: Fees. The Advisors' investment banking fees will be based on the following formula:
>
>> 0.0% if the Enterprise Value is below $15,000,000
>> 0.5% if the Enterprise Value ranges from $15,000,000 to $17,499,999
>> 1.0% if the Enterprise Value ranges from $17,500,000 to $21,499,999
>> 2.0% if the Enterprise Value ranges from $21,500,000 to $24,999,999
>> 2.5% if the Enterprise Value ranges from $24,500,000 to $29,999,999
>> 3.0% if the Enterprise Value ranges from $30,000,000 to $39,999,999
>> 4.0% if the Enterprise Value ranges from $40,000,000 to $49,999,999
>> 5.0% if the Enterprise Value is $50,000,000 or above
>
> Enterprise Value in this context is the Total Transaction Value divided by the percentage of

equity ownership held by an investor after the Transaction. Total Transaction Value in this context refers to total consideration paid for an equity interest in Tranzact including any seller financing, plus assumed debt (including bank indebtedness and shareholders and related party notes, but excluding trade and current payables). The fees will be applied as a percentage of the Transaction Value and will be contingent payable upon successful completion of the Transaction. Payment of these fees will be made at the time of closing of the Transaction.

First, in reading the above quoted "investment banking fee" formula in detail, it is not immediately clear what the listed "%" based on the "Enterprise Value" will be applied to in order to determine the "investment banking fee". Reading further into Section 4, one finds, however, the word "percentage" used in the sentence which states, "The fees will applied as a percentage of the Transaction Value. . ." Leaving one to wonder is this percentage applied to the "Transaction Value" the same "%" based on the "Enterprise Value"? Since, both the word percentage and the % symbol only appear once within Section 4 it is reasonable to deduce that percentage applied to the "Transaction Value" is the same "%" based on "Enterprise Value".

Second, in looking at how the word "fees" is used within Section 4, one wonders: Are the fees defined as a percentage of the "Transaction Value" the same "investment banking fees" set forth in the opening sentence of Section 4? Despite that the word "fees" appears in Section 4 three different times in three different contexts, it is reasonable to deduce that "fees" as it is used in the section heading is used to describe both the "investment banking fees" as well as the "retainer," which is described later in Section 4, and that the "fees" to be applied as a percentage of the "Transaction Value" refers to the investment banking "fees." Applying all the reasonable inferences as to the "investment banking fee" formula in the non-moving parties' favor, "investment banking fees" should be calculated under the Agreement as follows:

    0.0% of the "Transaction Value" if the "Enterprise Value" is below $15,000,000
    0.5% of the "Transaction Value" if the "Enterprise Value" ranges from $15,000,000 to $17,499,999

8

> 1.0% of the "Transaction Value" if the "Enterprise Value" ranges from $17,500,000 to $21,499,999
> 2.0% of the "Transaction Value" if the "Enterprise Value" ranges from $21,500,000 to $24,999,999
> 2.5% of the "Transaction Value" if the "Enterprise Value" ranges from $24,500,000 to $29,999,999
> 3.0% of the "Transaction Value" if the "Enterprise Value" ranges from $30,000,000 to $39,999,999
> 4.0% of the "Transaction Value" if the "Enterprise Value" ranges from $40,000,000 to $49,999,999
> 5.0% of the "Transaction Value" if the "Enterprise Value" is $50,000,000 or above

Now looking at this formula calculating the "investment banking fee," it is clear that the terms "Transaction Value" and "Enterprise Value" are both material terms to this provision of the Agreement because without a definition of either of those terms there is no way to calculate the amount of the "investment banking fee" to be paid to the defendants. Nevertheless, while the term "Enterprise Value" is defined under the Agreement, the term "Transaction Value" is left undefined.

Throughout the Agreement, where specific terms needed to be defined for purposes of the Agreement, those terms were capitalized in the Agreement and usually immediately defined within the text of the Agreement. Specifically, in the "investment banking fee" section of Section 4 in the Agreement, the terms that needed defining were: "Enterprise Value", "Total Transaction Value", and "Transaction Value", and each of these terms are defined immediately after they are introduced in the Agreement except the term "Transaction Value" which is left undefined within the Agreement.

Unlike the deduction used for the word "fees," or the word "percentage" it is not reasonable to deduce that "Transaction Value" is the same as "Total Transaction Value" within the Agreement because both terms are only used once within Section 4 and because the term "Total Transaction Value" is specifically defined. Accordingly, despite the manifest intent of the parties to provide for an "investment banking fee," there was no meeting of the minds as to the "investment banking fee" and no agreement was reached as to the payment of any "investment banking fees" because the material term "Transaction Value" was left undefined. See Feldman v. Allegheny Int'l, Inc., 850 F.2d 1217, 1223-4 (7th Cir. 1998)("Having neither set a price, nor a mechanism to calculate a price,

the draft cannot constitute a contract; there has been no meeting of the minds."); Goldstick v. ICM Realty, 788 F.2d 456, 461 (7th Cir.1986).

II. Contract Interpretation

    A. Findings of Rights and Liabilities as to the Schneider Sale

Under the Agreement, a "Transaction" is defined as:

(1) the sale or other disposition to another corporation, person, or business entity (an "investor") all or a portion of Tranzact's stock or assets, (2) an equity or quasi-equity investment in Tranzact by an investor or (3) a merger, consolidation or other combination of Tranzact with an investor.

It is undisputed in this case that on March 10, 2000, Tranzact sold to Schneider a portion of its assets, that Schneider retained no equity ownership in Tranzact, and that the Schneider Sale qualifies a "Transaction" under sub-section (1) of the Agreement's definition of "Transaction". What is disputed is whether an "investment banking fee" is due to the defendants as a result of the Schneider Sale. The short answer is that no "investment banking fee" is due because as a matter of law there was no contract for the payment of an "investment banking fee". See (Section I, supra.).

Notwithstanding the short answer, Tranzact argues that no "investment banking fee" is due even if there had been a contract for the payment of "investment banking fees" because there is no formula to calculate the "investment banking fee" per the Schneider Sale and because the formula to calculate the "investment banking fee" as applied to the Schneider Sale leads to an undefined number or zero.

Defendants argue that under the Agreement an "investment banking fee" of $875,000 is due because applying the Schneider Sale to investment banking formula, "Enterprise Value" goes to infinity and assuming that "Transaction Value" equals "Total Transaction Value," 5% of

$17,500,000 is $857,000. In the alternative, defendants argue that "Enterprise Value" as applied to the Schneider Sale really equals the fair market value of Tranzact after the Schneider Sale plus the value of the Schneider Sale or $47,935,400 plus $17,500,000 which equals $65,435,400. Since $65,435,400 is greater than $50,000,000 and again assuming that "Transaction Value" equals "Total Transaction Value," 5% of $17,500,000 is $857,000. Upon a complete review of the Agreement, this court finds that even if there was a contract for the payment of an "investment banking fee," no "investment banking fee" is due to the defendants under the Agreement per the Schneider Sale because (1) in the Agreement there is no formula for the payment of an "investment banking fee" where the qualifying Transaction is a sale of assets and not a sale of an equity interest and (2) applying the only formula set forth in the Agreement calculating the "investment banking fee" to the Schneider Sale leads to zero or an undefined number.

B. There is No Formula for the Payment of Additional Fees as to the Schneider Sale

Under Illinois law, a contract is to be construed strictly against the drafter. Liautaud v. Liautaud, 221 F.3d 981, 986 (7th Cir. 2000)(citations omitted). When a valid contract exists, the proper interpretation of any disputed terms in that contract is a question of law for the court to determine. Florida East Coast Ry. Co. v. CSX Transp., Inc., 42 F.3d 1125, 1128 (7th Cir.1994). "[T]he court must construe the contract as a whole to derive the intentions of the parties." WCC Funding Ltd. v. GAN International, 871 F.Supp. 1017, 1024 (N.D.Ill.1994). While the "question of whether the parties intended to enter into a contract is an issue to be decided by the trier of fact," Seymour v. Williams, 249 Ill.App.3d 264, 270, 618 N.E.2d 966, 971 (1st Dist.1993), "[t]he intention of the parties to [the] contract must be determined from the instrument itself and the construction to be placed on the instrument where no ambiguity exists is a question of law." Sutton Place

Development, Inc. v. Bank of Commerce and Industry, 149 Ill.App.3d 513, 516, 501 N.E.2d 143, 145 (1st Dist.1986). In interpreting a contract, Illinois law requires that "clear and unambiguous terms in the contract must be given their ordinary and natural meaning." CSX Transp., Inc. v. Chicago and North Western Transp. Co., Inc., 62 F.3d 185, 190 (7th Cir. 1995). A contract must be interpreted as a whole, giving meaning and effect to each provision. Id. The analysis of interpreting a contract, therefore, begins "with the language of the contract itself. If the language unambiguously answers the question at issue, the inquiry is over." Emergency Medical Care, Inc. v. Marion Medical Hospital, 94 F.3d 1059, 1060-61 (7th Cir.1996) (citations omitted) (interpreting Illinois law).

First, this court assumes for purposes of this discussion only that there was a valid contract between the parties for the payment of "investment banking fees." In addition, since it is undisputed that defendants were the primary drafters of the Agreement, this court must construe the Agreement strictly against defendants. Accordingly, in viewing the evidence in light most favorable to defendants, this court finds as a matter of law that there is no formula provided in the Agreement to calculate the payment of "investment banking fees" in the situation where only assets are sold. The Agreement only provides a formula for "investment banking fees" for the sale of Tranzact's equity not for the sale of Tranzact's assets.

Starting with the language of the Agreement, Section 4 provides that upon the successful completion of a "Transaction" defendants are entitled to an "investment banking fee." Section 4 also unambiguously states that the investment fee owed to defendants is determined by the percentage of equity ownership held by an investor after the "Transaction" where that percentage of equity ownership is divided into the total consideration paid for an equity interest in Tranzact.

Looking at the Agreement as a whole, giving meaning and effect to each provision, since the "investment banking fees" section is only triggered upon the completion of a qualified "Transaction" and since a qualified "Transaction" is defined as three separate and distinct types of transactions; a sale of assets, an investment with the investor retaining equity, or a merger or acquisition, it follows that proper draftsmanship would have provided for three separate formulas under Section 4 in order to calculate the appropriate "investment banking fee" for each type of triggering "Transaction" or at the very least a general formula which could properly be applied to each type "Transaction." Section 4, however, only has one formula for calculating the "investment banking fees" and that formula is unambiguous and specifically defined in terms of equity ownership held and equity interest purchased. No where in Section 4 or anywhere else within the four corners of the Agreement is there a formula for calculating the "investment banking fee" owed in the event of a sale of an asset. Accordingly, finding no corresponding formula for the calculation of "investment banking fees" where the sale of assets is the qualifying "Transaction," this court finds that no investment banking fees are due to defendants as a result of the Schneider Sale.

C.     <u>Applying the Schneider Sale to the "investment banking fee" Formula provided Leads to Zero or an Undefined Number</u>

Again assuming that there was a valid contract for the payment of "investment banking fees," and now assuming that the only "investment banking fee" formula provided in Section 4 of the Agreement is somehow applicable to the Schneider Sale, this court still holds that no fees are due to defendants because applying the Schneider Sale to the formula set forth in Section 4 of the Agreement leads to zero or a number undefined in mathematics.

Again Section 4 unambiguously states that the "investment banking fees" are based upon a

13

percentage of the "Transaction Value" and that percentage is to be based upon the "Enterprise Value." "Enterprise Value" is defined as the "Total Transaction Value" divided by the percent equity ownership held by an investor after the "Transaction" and the "Total Transaction Value" is defined as the total consideration paid for an equity interest in Tranzact. Since it is undisputed that the percent equity owned by Schneider after the Schneider Sale was zero and that Schneider paid no consideration for any equity interest in Tranzact, the appropriate substitutions provides:

"Investment banking fee" = % of "Transaction Value"
% is between 0% and 5% as determined by the "Enterprise Value", and
"Enterprise Value" = $0 ÷ 0%

Without performing a single mathematic calculation, it goes without saying that no "investment banking fee" is due since there was no consideration paid for an equity interest in Tranzact. Doing the math, zero divided by any number is zero. Therefore "Enterprise Value" is zero, which is less that $15,000,000 making % equal to zero, and 0% of any number is zero. Nothing from nothing leaves nothing.

Defendants, however, ignoring the plain language of the Agreement and unashamedly benighted to the basic principles of mathematics, argue that applying the Schneider Sale to the formula provided in Section 4 makes "Total Transaction Value" equal to $17,500,000 and leads to the following conclusions:

"Enterprise Value" = $17,500,000 ÷ 0 = ∞

and since infinity is greater than $50,000,000, and assuming "Transaction Value" equals "Total Transaction Value", the appropriate substitutions provide:

5% of $17,500,000 = $875,000

Division by zero is an illegal function in mathematics. See Dr. Hossein Arsham, The Zero

14

Saga & Confusions with Numbers, *at* http://ubmail.ubalt.edu/~harsham/zero/ZERO.HTM. If $17,500,000 divided by zero equals infinity then does infinity multiplied by zero equal $17,500,000? Furthermore, is it even possible to divide $17,500,000 into zero equal parts? Finally, is there any number that when multiplied by zero equals $17,500,000? The answer to all of the above questions is no and proves unequivocally that:

$$\$17,500,00 \div 0 \neq \infty$$

*Q.E.D.*

Notwithstanding that division by zero is a mathematically illegal operation, the idea that the amount "Enterprise Value" could equal ∞ or infinity is equally beyond the bounds of mathematics since the symbol ∞ or infinity stands for an infinite unmeasured quantity which is by definition not any number. See Dr. Hossein Arsham, The Zero Saga & Confusions with Numbers, *at* http://ubmail.ubalt.edu/~harsham/zero/ZERO.HTM. Accordingly, based on the undisputed facts of this case and applying well settled principles of mathematics, this court finds that no "investment banking fee" is due to defendants per the Schneider Sale.

D. <u>Defendants' Extrinsic Evidence Defining "Enterprise Value" will not be Allowed</u>

In the alternative to its mathematically challenged argument, defendants argue that a "investment banking fee" of $857,000 is still due because "Enterprise Value" as defined by the Agreement really means the value of the enterprise. Assuming that there is a valid contract as to the payment of investment bank fees, this court finds that the language of the Agreement defining "Enterprise Value" is reasonably and fairly susceptible to only one meaning and that no one, who knows the context of the Agreement, could in good faith maintain that "Enterprise Value" means something other than what the Agreement explicitly states.

15

Where a contract is unambiguous a court must determine the meaning of the contract as a matter of law, Ryan v. Chromalloy American Corp., 877 F.2d 598, 602 (7th Cir.1989), and whether an ambiguity exists in a contract is a question of law. U.S. v. 4500 Audek Model Number 5601 AM/FM Clock Radios, 220 F.3d 539, 543 n.6 (7th Cir. 2000). "A contract is unambiguous if it is susceptible to only one reasonable interpretation, or put another way, a contract is ambiguous only if both parties were reasonable in adopting their different interpretations of the contract." Murphy v. Keystone Steel & Wire Co., 61 F.3d 560, 564 (7th Cir.1995). There are two kinds of contractual ambiguity: intrinsic ambiguity, i.e., where the contract is "reasonably and fairly susceptible to more than one meaning," and extrinsic ambiguity, were the contract is "clear on its face but someone who knows the context of the contract would know that the contract means something other than what it seems to mean." Home Ins. Co. v. Chicago and Northwestern Transportation Co., 56 F.3d 763, 768 (7th Cir.1995) (citation omitted).

Before advancing its own theory of what the term "Enterprise Value" really means, defendants first state that "the Agreement's 'enterprise value' term is not ambiguous." See (Defs.' Resp. to Pl.'s Motion for Summary Judgment at 6). This admission by the nonmoving party is sufficient to allow this court to completely exclude any extrinsic evidence submitted to define the term "Enterprise Value" as a matter of law. Notwithstanding its admission, however, defendants argue that the term "Enterprise Value," in the Agreement, is really an attempt by the parties to tie the "investment banking fee" to the real value of Tranzact at time of a "Transaction." See (Defs.' Resp. to Pl.'s Motion for Summary Judgment at 6-8). In substantiation, defendant's paid analyst offers extrinsic evidence to define "Enterprise Value" and fulfill the intent of the Agreement as stated by the defendants. Defendants' analyst states in his report that there needs to be a calculation

16

of the percentage of equity ownership Schneider would have held if Schneider had purchased common stock instead a an asset, since applying the Schneider Sale literally to the Agreement yields a nonsensical economic result. See Hofman, Cornelius A., Economic Analysis, Tranzact v. Evergreen, June 6, 2001 at 2. Graciously, Hofman calculates this new enterprise value by calculating the fair market value of Tranzact after the divestiture of its freight payment business and then adding to it the fair market value of Tranzact's freight payment business to the fair market value of Tranzact without the asset sold to Schneider. Thus, Hofman concludes and defendants' argue that the enterprise value of Tranzact is $65,435,400, the fair market value of Tranzact without the asset sold to Schneider $47,935,400 plus the fair market value of the Schneider Sale, $17,500,000. Defendants' argument that "Enterprise Value" means value of the enterprise or is equal to $65,435,400 is completely outside the four corners of the Agreement and without merit.

This court holds that the term "Enterprise Value" is unambiguous in the Agreement. Accordingly, this court excludes that the analytical report of Cornelius A. Hofman and finds the report to be completely subjective, biased, self-serving and otherwise inadmissible as evidence at trial. Additionally, this court finds that "Enterprise Value" as applied to the Schneider Sale leads to a "a nonsensical economic result." Therefore no "investment banking fee" is due to defendants.

III.  Breach of Contract

In Illinois, to state a claim for breach of contract, Tranzact must adduce evidence in the record to create an issue of fact that a valid contract existed, that Tranzact performed its contractual obligations, that defendants breached their contractual obligations, and that Tranzact suffered damages as result of defendants' breach. See Allstate Ins. Co. v. Winnebago County Fair Ass'n, 131 Ill.App.3d 225, 233, 475 N.E.2d 230, 236 (2nd Dist. 1985). As to plaintiff's claim, the threshold

17

issue is whether the "retainer" and additional invoices paid by Tranzact to defendants completed Tranzact's contractual obligations under the Agreement. Having found that there was no contract between the parties for the payment of any "investment banking fees" and having held that as for the Schneider Sale no "investment banking fees" were due to defendants, this court now holds that Tranzact's contractual obligations under the Services Contract were satisfied upon paying defendants $40,000. Additionally, based on the undisputed evidence in the record this court also holds that defendants satisfied all of its contractual obligations under the Services Contract as of the Services Contract termination date of July 14, 1999.

As for the additional invoices paid by Tranzact to defendants, this court finds that no additional monies were due under the Services Contract, however, each invoice or request for an advance sent by defendants to Tranzact constituted an offer by the defendants to increase the amount of "retainer" originally agreed upon under the Services Contract and that Tranzact by paying accepted the offer, thereby forming and fulfilling separate contracts per each invoice or advance paid.

## CONCLUSION

For all the above stated reasons, plaintiff's motion for summary judgment is GRANTED. This case is dismissed in its entirety with prejudice. All pending motions are moot. All previously set dates are stricken.

ENTER:

James F. Holderman
JAMES F. HOLDERMAN
United States District Judge

DATE: September 6, 2001